## Lander Kirke Whiton and Walter Starr Whiton v. Louise Whiton.

1.   CONTRACTS—*Agreement to Leave Property by Will.*—An agreement, made upon a good consideration, to leave property by will, is valid, and if the party making such an agreement fails to perform and dies intestate, or disposes of his property by will or by gift of testamentary character, contrary to the agreement, the courts will enforce the agreement against his heirs, legatees or devisees, when it can be equitably done.

2.   SAME—*Restricting the Power to Dispose of Property.*—As a general proposition such a contract can not operate to limit the power of the owner to use or dispose of his property during his lifetime.   But this unrestricted power of disposal, by use or by gift *inter vivos*, does not extend to permit a disposal during life which is in effect a testamentary disposal and contrary to agreement.

3.   STATUTE OF FRAUDS—*Where it Does Not Apply.*—Where the consideration of an agreement, the payment of a sum of money, has been fully performed, and conditions of the contract are contained in a will executed by one of the parties, the statute of frauds does not apply.

**Bill to Enforce an Agreement.**—Trial in the Circuit Court of Cook County; the Hon. OLIVER H. HORTON, Judge, presiding.   Hearing and decree dismissing the bill for want of equity.   Appeal by complainants.  Heard in this court at the March term, 1898.   Reversed and remanded, with directions.   Opinion filed July 21, 1898.

### STATEMENT.

The bill of complaint in this cause avers that appellants and appellee are the only surviving children of Henry K. and Louise L. Whiton, both deceased; that Henry K. Whiton died in 1886; that by his will he bequeathed to Louise L. Whiton, his wife, among other things, all his bank stock and certain life insurance; and the residue of his estate was devised and bequeathed to Samuel G. Bailey and Warren J. Durham, as his executors and trustees.

By the fifth clause of the will the trustees were to take the residuary estate, collect the rents, issues and the profits thereof, and as soon as practicable to sell and convert into money all the real estate and unsecured claims and demands, and to invest the same in interest-bearing securities and then pay the dividends or income from such secured estate over to the wife to be her own property and to be used for her own support and the support and education of her children.

The will further provided that when the eldest child of testator and Louise L. Whiton should reach the age of twenty-five years, the residuary estate should be divided into as many equal parts as there should be children surviving, and one of such parts paid over to such child; and in like manner when each of the other children should reach such age, such child should receive his or her part.

The bill averred that Bailey and Durham, as executors and trustees, received letters testamentary and commenced the administration of their trust; that a few weeks prior to the 6th of June, 1895, Louise L., the mother, stated to appellants that she wanted more money out of her husband's estate; that she wanted $12,000, but that the trustees, Bailey and Durham, would not pay her any more money without the consent of the appellants and appellee, upon the ground that she had received all that she was entitled to out of said estate; that she had a power of attorney from her daughter, the appellee, authorizing the mother to do in the matter whatever she (the mother) thought proper and right, and that she could get the money if appellants

would consent to an order on the trustees to that effect, to be entered in a certain case then pending in the Circuit Court of Cook County, Illinois, wherein appellant Lander Kirke Whiton was complainant, and said Bailey and Durham and others were defendants; that she stated to appellant Starr Whiton, that if he would consent to the payment to her of $12,000 by Bailey and Durham, she would make it all right with him in her will; that appellant Lander Kirke Whiton declined to consent to the entry of such order, or to give his authority for the payment of $12,000 to her, or any other amount, because, as he stated to his mother, she had theretofore threatened him that she would disinherit him in her will, and that he was satisfied that his mother had received from the estate more than she was entitled to receive in accordance with the will and the condition of the estate; that thereupon the mother stated to appellants that she had no such disposition (to disinherit them), and in a conference had about the 28th day of May, 1895, it was proposed to the mother that she make a will, leaving her estate to her three children, appellants and appellee, equally, share and share alike; that then and there it was agreed by and between appellants and their mother that the former would consent to the entry of an order, such as desired, in said cause, authorizing and directing Bailey and Durham to pay over to their mother $12,000 in securities and money upon condition that she should execute her will as above stated.

That on the 5th day of June, 1895, in pursuance of said agreement last mentioned, the mother made, executed, delivered and published her last will and testament, which was duly witnessed by two subscribing witnesses, a copy of which, with the exception of the signatures of the testatrix and the subscribing witnesses, is contained in the bill; that the will, in substance, after revoking any former wills, provided for the payment of all her debts and funeral expenses, and gave to her three children, the appellants and appellee, all the estate of which she might die possessed, in equal parts, share and share alike; that thereupon the appellants

and the mother for herself and as attorney in fact for appellee, together with the solicitor of said appellee, consented in writing to the entry of an order to be entered in the said chancery suit directing the payment of the $12,000 in cash and securities to Louise L. Whiton; that such will was delivered to the Northern Trust Company; and afterward Bailey and Durham, as such executors and trustees, in pursuance of the order of court, paid and delivered to said Louise L. Whiton, from the estate of Henry K. Whiton, money and securities amounting to and of the value of $12,000.

That Louise L. Whiton, the mother, died on or about December 27, 1896; and that prior to her decease, on or about November 21, 1895, without the knowledge of appellants, she made another will by which she bequeathed to appellants and one Arthur L. Whiton, a son of the father by a former wife, the sum of $1,000 each, and the residue of her estate, of the value of upward of $40,000, to appellee.

That since the death of the mother the appellee has informed the appellant Walter Starr Whiton, that when she and her mother were in Vienna, Austria, in the year 1896, the mother, by gift and transfer, gave to appellee all the estate of the mother, of every kind, being various securities specified in the bill, to the value of upward of $40,000, all of which, with the exception of twenty shares of bank stock, was received by the mother from the estate of Henry K. Whiton.

That some time after the 5th of June, 1895, the said Louise L., without the knowledge or consent of appellants, took her will of the 5th of June away from the Northern Trust Company, where she had deposited it in accordance with the agreement between her and appellants; and appellants have no knowledge where it is, but they charge that it has been lost or destroyed; appellants further charge that it was the evident intention on the part of the said Louise L. Whiton in her lifetime to violate her agreement made with appellants on the 5th day of June, 1895; first in the execution of her will of November 21, 1895, then after-

ward by making the gift in her lifetime to the said appellee.

That the gift to appellee by said Louise L. Whiton in her lifetime of the property, consisting of promissory notes, mortgages and bank stock, was made without any consideration from the appellee to said Louise L. Whiton except natural love and affection; and appellants charge that the same is not sufficient in law to support the gift to appellee as against said agreement between appellants and the said Louise L. and the said will made the 5th of June, 1895.

That on the 5th of June, when the agreement was made between appellants and Louise L. Whiton, the net income of the residuary estate of Henry K. Whiton was less than the amount which had been paid to the said Louise L. Whiton under the fifth clause of the will of Henry K. Whiton, and that there was nothing due to the said Louise L. Whiton from said estate; on the contrary, she had largely overdrawn.

Bill prays for an account of the property given to appellee by said Louise L. Whiton; for a decree finding and directing that appellants and appellee are each entitled to one-third of the property received by appellee as such gift; that the agreement of the 5th of June, as evidenced by said will of Louise L. Whiton on that day made, shall be performed, and prays for general relief. There was answer of appellee to the bill and replication thereto. The answer alleged that the order for the payment of the $12,000 from the estate of Henry K. Whiton was agreed to by appellants in order to secure from Mrs. Whiton a release of all further interest in the estate, and denied that there was any other condition for the consent to such order, and denied specifically that the consent to the order was a consideration for any agreement by Mrs. Whiton to dispose of her property by will. The answer also denied the making of the alleged will of June 5, 1895, and set up the following writing executed by appellants and appellee:

"In re Estate of Louise L. }
    Whiton, deceased. }

We, the undersigned, Lander Kirke Whiton, Walter

Starr Whiton and Louise Whiton, children of the said Louise L. Whiton, deceased, are advised that her certain last will and testament, having date November 21, 1895, is in the hands of Messrs. Dent & Whitman.

Said Louise L. Whiton having disposed of all her estate and effects after the date of said will, and having left no estate to be administered upon, we think it unnecessary to have any cost or expense incurred in reference to probating said will.

The debts of said Louise L. Whiton have been paid.

Chicago, 6th, 1897.                    LANDER KIRKE WHITON.
                                       WALTER STARR WHITON.
                                       LOUISE WHITON.

An amendment to the answer sets up that the alleged agreement was not to be performed within one year, and was not "manifested by writing." Evidence was heard by the court, and upon the final hearing the bill was dismissed for want of equity.

JOHN S. COOPER, attorney for appellants, contended that an agreement, upon a consideration to leave property by will, is valid, and as between the parties, such will, when made, is irrevocable; and in case the party making such testamentary agreement, violates the same by leaving a will contrary to such agreement, or dies intestate, such agreement will be enforced, against his heirs, devisees, legatees, donees and purchasers with notice or without consideration. Johnson v. Hubbell, 10 N. J. Eq. 332; Van Duyne v. Freeland, 12 N. J. Eq. 142; Carmichael v. Carmichael, 72 Mich. 76; Parsell v. Stryker, 41 N. Y. 480; Gupton v. Gupton, 47 Mo. 37; Wright v. Tinsley, 30 Mo. 389; Hiatt v. Williams, 72 Mo. 214; Logan v. Weinholt, 7 Bligh (N. R.) 1; Jones v. Martin, 8 Brown's Cases in Parl. 242; Randall v. Willis, 5 Vesey, 266; Lewis v. Maddox, 8 Vesey, 150; Perdue v. Jackson, 1 Russ. Ch. 1; Chilliner v. Chilliner, 2 Vesey Sr. 527; Fortesque v. Hennah, 19 Vesey Jr. 67; Willis v. Black, 4 Russ. Ch. 171; Gregor v. Kemp, 3 Swanston, 404; Brinker v. Brinker, 7 Penn. St. 53; Lord Walpole's Case (Rufour v. Perren) 2 Hargrave's Juridical Arguments, 272.

The agreement by which Mrs. Whiton made her will, bequeathing her estate to her three children equally, in consideration of the sum of $12,000, was "concluded, certain, unambiguous, mutual, and upon a valuable consideration; it was perfectly fair in all its parts free from any misapprehension, fraud or mistake, imposition or surprise; it was not an unconscionable or hard bargain; its performance will not be oppressive upon appellee; and it is capable of specific execution through a decree of the court."

Pomeroy, in his Equity Jurisprudence, says, that the above, in suits for specific performance, are "the elements, conditions and incidents, as collected from the cases," which govern courts of equity in administering this species of relief.   3 Pom. Eq. Sec. 1404, note 1.

When all these elements, conditions and incidents exist, the remedial right is perfect in equity.   3 Pom. Eq., Sec. 1404.

JOHN M. GARTSIDE and PENCE & CARPENTER, attorneys for appellee.

MR. JUSTICE SEARS delivered the opinion of the court.

We think that the evidence supports the allegations of the bill of complaint.   Upon the facts alleged and proved the appellants sought relief, asking the court to decree that the property given by Mrs. Whiton to her daughter, appellee, was taken by appellee subject to the agreement of Mrs. Whiton to will a portion thereof to appellants, her sons, and that it was held by appellee as a trustee for the use promised by her donor to appellants; and to decree that appellee, as such trustee, carry out the agreement.

Counsel for appellee urge various reasons why this relief should not be granted, which are, in substance, first, that the alleged agreement with appellants is not sufficiently established; secondly, that the alleged consideration therefor is not shown; thirdly, that if established, the agreement is so uncertain as to its subject-matter that it will not be enforced; fourthly, that in any event such an agreement

can not operate to restrain complete dominion of the maker over her property during her lifetime, and that the gift to appellee being an out and out gift *inter vivos* was good, irrespective of such agreement; and finally, that the agreement in question comes under the application of the statute of frauds.

We think it clearly established by the evidence, that a distinct agreement was made by Mrs. Whiton to give by will to each of appellants a third part of the property which she might own at her death. John J. Knickerbocker, Esq., the lawyer who effected the bringing together of the parties to the agreement and the settlement of their then differences, testified as follows:

"Mrs. Whiton said she wanted more money; said she wanted some money from the trustees. That first statement was made when Kirke (one of appellants) was not there. Said she wanted Starr (one of appellants), one of her sons, to help her get money from the trustees. Starr Whiton said he wanted to see Kirke, his brother. Mrs. Whiton asked Starr to go and see his brother and bring Kirke to see his mother. Subsequently, and on the same day, when Starr was there with Kirke and their mother, she said to both of them that she wanted their aid, their consent to take more money out of the hands of the trustees. After, on consultation, they refused. They said they would not do it; refused to do it. Kirke left the office and the interview ceased. There were many conversations at which only Starr and his mother and myself were present, but the next conversation at which they were all present was in the office of Col. Cooper. We were assembled at Col. Cooper's office, and there was there the Colonel, Mrs. Whiton, the two boys, Starr and Kirke and myself, and I had dictated this will for her. The first that her attention was called to it was, I called them all in the room and the will was dictated and written, and I told Mrs. Whiton that there was trouble between her and her sons, and she wanted to know what it was; she asked me what it was. I said to her, that they said that she had

threatened their disinheritance. She said, well, she said, 'I didn't mean that.' And Kirke says, 'Well, mother, you know you said it, and Starr and myself have not felt very well about it since.' And Mrs. Whiton said, 'Well, then, you are going to refuse to let me have any more money from the trustees.' And Kirke says, 'We have not said that yet, mother, but we don't like what you said about us and our father's estate, and we should want to know that that would not happen.' Q. What would not happen? A. The disinheritance, that was what we were talking about, and Mrs. Whiton asked me how that could be fixed, how it could be arranged, and I told her, in the presence of the boys, what I had told them in a conversation with them at Kirke's office before this interview the same day and at Col. Cooper's, and I repeated the conversation in their presence and hearing of what I had said to the boys and what the boys had said to me. I said to her, 'Mrs. Whiton, I have told these boys that I do not think that you contemplate anything of that kind, or that you contemplate their disinheritance.' I told them that I was so sure of it, that I felt satisfied that if they would come over here and consent to an order for your taking certain amount out the estate—such an amount out of the estate, by order of court, as you ask for, that you would put it in such a way that they could not be disinherited; that you would make your will and give them their share when you died. Mrs. Whiton said to me in their presence, 'I like that, Mr. Knickerbocker, of your saying how I shall will my property, or tell me what I shall do with it.' I told her I did not purpose to do that; I had no right to do it, but that it was a family affair. They were all agreed that they wanted to close the estate; they wanted to get it out of the hands of the trustees to save expenses, and that if they were a united family it did not seem to me there was much difference who held the property, and the boys would feel better about it. They would be entirely satisfied and contented to let her take what she asked for, the $12,000, pro-

vided she would make her will and divide it in equal parts between the brothers and the sister, the three children. Now, I says, 'Because I have drafted this will and it is here, you do not have to execute it; but this trouble is with your children, and it may be the shortest way to get peace in the family and to get what you want, if you intend that they shall have that share in your estate.' Well, she said she liked that, but she supposed she better do it, as she wanted to get money or securities, and she did do it. Q. Did what? A. Signed the will. The Court: Right there in their presence? A. Yes, sir, and in the presence of some other people; Mr. Cooper, myself, Mr. Lancaster, Miss Burnham, the stenographer, and I think John A. Henry was there. That done, I think it was late in the afternoon—that done, concluded the exercises of that day, excepting some things Mrs. Whiton said." Is shown a document (the order entered on the 6th of June for payment of $12,000 to Mrs. Whiton). (To complainants' counsel:) "That was dictated in your office; I think you did it on the day and date on which the will was prepared. Q. At the time the will was prepared and executed? A. Yes, sir, that was part of the transaction." Order introduced in evidence. Signatures were made as certified. Does not remember whether document was made before or after the execution of Mrs. Whiton's will, but was made at the same time.

Q. "I will ask you whether there was any conversation between the parties there present when the will was executed, I mean between Mrs. Whiton and complainants, as to what should be done with the will? A. That it be delivered by me to the Northern Trust Company."

The testimony of this witness was in nowise contradicted. The will, to the execution of which he testified, was afterward, on August 2, 1895, taken from the Northern Trust Company by Mrs. Whiton, and nothing further was disclosed as to what had become of it. A stenographer's copy was, however, introduced in evidence. The will, after providing for funeral expenses, debts, etc., distributed the entire estate

of testatrix between appellants and appellee, the survivor
or survivors of them, share and share alike. The testimony
of Mr. Knickerbocker, together with this will, establishes a
distinct agreement as to which there can be no uncertainty
of provision or subject-matter, save such uncertainty as to
the latter as might arise by the subsequent use or disposal
of her estate during life by Mrs. Whiton. We do not regard
the writing signed by appellants in relation to the will of
November 21, 1895, as at all inconsistent with the existence
of this agreement. If the agreement existed, they had no
interest in having that will probated, as their rights were
in conflict with the provisions of that will.

We think it also established that there was a sufficient
consideration moving to Mrs. Whiton for the making of this
agreement. Counsel for appellee argue that the $12,000
allowed to Mrs. Whiton by the order of court, to which
appellants consented, was due to her and should have been
allowed in any event, whether appellants consented or not.
From an examination of the evidence we are convinced
that no such sum was then due to Mrs. Whiton, she having
before that time received all that was due to her under the
fifth clause of the will of Henry K. Whiton. But it was in
any event a disputed and contested matter, and the settle-
ment of the controversy and the consent to an order as
desired by Mrs. Whiton was a good and sufficient consider-
ation for the agreement; and if, as we conclude from the
evidence, Mrs. Whiton was entitled to no part of the $12,000,
then or thereafter, except by the consent of appellants, it
was, in effect, a payment to her of $8,000 of the money of
appellants. The subsequent execution of the trust deed to
secure a note of $5,000 for the benefit of Mrs. Whiton has
no bearing whatever upon this question, as argued by
counsel, for it was done under another and entirely different
provision of the Henry K. Whiton will, viz., to enable her
to purchase another homestead. Neither do we regard as
significant in this connection the fact that in a petition filed
in the Circuit Court appellants alleged that Mrs. Whiton
had relinquished all interest in the Henry K. Whiton

estate by quit-claim to appellants and appellee in consideration of the sum of $12,000 and the mortgage securing the $5,000. It was because she had then received all that was due to her from the estate that she thus quit-claimed, and a recital to that effect is in no way inconsistent with the fact that in receiving this amount she had received much more than was due her, and that the surplus constituted a consideration for the agreement in question. Counsel argue that by this quit-claim Mrs. Whiton relinquished some interest in the realty of the estate. We find in the evidence no warrant for such conclusion. On the contrary, it would seem that at the time of the execution of this release Mrs. Whiton had nothing whatever remaining which she could be entitled to receive from the estate under the will. We therefore conclude that the consideration for the agreement was sufficient.

We come, then, to a consideration of the argument that the agreement is of a nature so uncertain that courts will not enforce it. We think that this contention can not be maintained.

It may be regarded as settled that an agreement, made upon good consideration, to leave property by will, is valid, and if the party making such an agreement fails to perform and dies intestate, or disposes of his property by a will or by gift of testamentary character contrary to the agreement, the courts will enforce the agreement against his heirs, legatees or devisees, when it can be equitably done. 3 Parsons Cont. (6th Ed.) 406; Gregor v. Kemp, 3 Swanst. 404; Jones v. Martin, 5 Vesey, 265 (in note); Randall v. Willis, Id. 262; Fortescue v. Hennah, 19 Vesey, 67; Logan v. Weinholt, 7 Bligh (N. S.), 1; Johnson v. Hubbell, 10 N. J. Eq. 332; Van Duyne v. Vreeland, 12 Id. 142; Parsell v. Stryker, 41 N. Y. 480; Carmichael v. Carmichael, 72 Mich. 76; Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Id. 37; Hiatt v. Williams, 72 Id. 214; Brinker v. Brinker, 7 Pa. St. 53.

In Johnson v. Hubbell, the New Jersey Court said: "There can be no doubt but that a person may make a

Whiton v. Whiton.

valid agreement binding himself legally to make a particular disposition of his property by last will and testament. The law permits a man to dispose of his own property at his pleasure, and no good reason can be assigned why he may not make a legal agreement to dispose of his property to a particular individual, or for a particular purpose, as well by will as by a conveyance to be made at some specified future period, or upon the happening of some future event. It may be unwise for a man, in this way, to embarrass himself as to the final disposition of his property, but he is the disposer, by law, of his own fortune, and the sole and best judge as to the time and manner of disposing of it. A court of equity will decree the specific performance of such an agreement upon the recognized principles by which it is governed, in the exercise of this branch of its jurisdiction."

In Parsell v. Stryker, the New York Court said: "As to plaintiff's equities, it made no difference whether the agreement was to deed the farm at a future day, on performance by plaintiff, or to devise the farm by a will made in the lifetime of the party, a court of equity will decree the specific performance of the latter agreement after death, when otherwise unobjectionable, equally with a contract to convey while living."

In Carmichael v. Carmichael, the Michigan Court said: "There is no doubt but it is competent for a person to make a valid agreement binding himself to make a particular disposition of his property by last will and testament. * * * But defendants claim that the contract, resting partly in parol, is void under the statute of frauds, etc. It is to be remembered, however, that the contract on the part of the father has been fully performed, and that Mrs. Carmichael, the mother, has received and accepted the benefits of such performance. A court of equity, under these circumstances, will not permit her to rescind this contract."

In Wright v. Tinsley, the Missouri Court said: "On principle, there would seem to be no ground to doubt that a person may, by valid agreement, renounce the power to

dispose of his property at his pleasure; may bind himself to make a will in a particular way on proper considerations; and that courts of equity will enforce such agreements under proper circumstances, the same as in other cases of valid contracts. While in some of the cases cited the courts refused to decree a specific performance of the agreement, they all recognized the power of individuals to make binding contracts of this nature, and relief was denied on different considerations."

Mr. Parsons, in reference to such agreements, says: "Yet it has been held to be within the jurisdiction of equity to do what is equivalent to a specific performance of such an agreement, by requiring those upon whom the legal title has descended to convey the property in accordance with its terms." As holding against this well established doctrine, counsel cite various decisions of our Supreme Court. We do not so understand these decisions, nor do we find in any one of them any expression which is at all in conflict with the rule announced.

In Wallace v. Rappleye, 103 Ill. 229, it was sought to enforce an alleged parol agreement by the father of an illegitimate child to support the child and make her his heir, the promise being made to the mother. The court, after criticising the degree of the proof, held that specific performance of such a contract, even when satisfactorily proven, is not a matter of right in the party, but a matter of sound discretion in the court, which grants or withholds relief according to the circumstances of each particular case, and that the uncertainty of a contract "to make one an heir," as to the amount of the party's property to be affected, is a circumstance to be considered in exercising this discretion. The court also held that there had been no act of performance by the other party to the contract which operated to take it out of the statute of frauds. In the case here under consideration, no such uncertainty exists. In the Wallace case the court carefully distinguished between the facts of that case and the facts of Van Duyne v. Vreeland, *supra*. Moreover, in the Wallace case, there was shown to exist

another contract by the same person to make certain provisions by will for another and a legitimate child.    And the court makes the existence and validity, and, by inference, the enforceability of this latter contract a ground for refusal to specifically enforce the former, saying:  " But if a case for specific performance were made out, we are of opinion that the covenant made by Wallace to Celia W. Wallace should be held a bar to any relief as against this appellant. By that covenant with Mrs. Wallace, in consideration of the release by her of her dower in his estate, Wallace agreed that on his death his and her son, the appellant, should receive the amount or portion of Wallace's estate that he was entitled to by the laws of Illinois.  *  *  *  He (appellant) does not stand as a mere heir, a volunteer, but he stands in the position of a purchaser, the purchase price being Mrs. Wallace's right of dower.  *  *  *  The covenant did provide that Wallace should not devise away any portion of appellant's share as heir, and it would be equally within the spirit and intent of the covenant that he should not contract it away by making another person an heir. The effect would be the same to diminish appellant's portion, whether a devisee was brought in by will, or a co-heir was brought in by contract, to share in the estate."

In Mills v. Newbury, 112 Ill. 123, the facts are in no manner similar to the facts of the case here.    The uncertainty as to subject-matter there arose from the fact that the suit was carried on to assert a trust as to a remainder of property, uncertain because subject to use by one yet living, and by whom it might be completely disposed of or spent.

In Woods v. Evans, 113 Ill. 186, the agreement alleged was to take, maintain and educate an orphan of no kin to the promisor, and to give her, at his death, a child's part of his estate.    The court again announced the rule that specific performance of such contracts was a matter, not of right, but of discretion, to grant or deny relief, as may appear equitable under all the facts and circumstances of the case; and held that the contract there was not based upon a sufficiently adequate consideration, and could not be regarded

as so fair and just and certain as to be specifically enforced; holding, too, that where it is attempted to enforce a distribution of an estate differently from the manner provided by law, a contract in parol, relied upon for such effect, should be looked upon with jealousy and weighed in the most scrupulous manner. The uncertainty of subject-matter arising in that case resulted from the words of the undertaking, viz., to give a child's part. The court, in commenting upon this uncertainty, asked: "At the time the agreement set out in the bill was made, what portion of Short's property was complainant entitled to receive under the contract? Was it one-third, a fourth, a fifth or a tenth?" And the court adds, as a ground for refusal of relief, "There is another serious objection to the enforcement of the contract in a court of equity. Its enforcement would work great injustice to the wife and lawful heirs of Short."

In Shaw v. Schoonover, 130 Ill. 451, the decision turned upon the sufficiency of proof.

In Pond v. Sheean, 132 Ill. 312, the court held that the contract was within the application of the statute of frauds, as the subject-matter was in part lands, and the contract, being treated as an entirety, could not operate upon the personalty alone.

In Sloniger v. Sloniger, 161 Ill. 270, the decision rested upon the insufficiency of proof of a contract and upon the application of the statute of frauds. The court said: "The statements in evidence of witnesses as to declarations made by Joel Sloniger in his lifetime are not so clear, certain and unambiguous as to establish, in our view of the case, a contract, taken in connection with the will, which we can enforce, and resulting in a disposition of his property different from that which would be made by law. * * * The cases cited by appellant's counsel in support of the proposition that the will in this case should be construed as a contract and enforced accordingly, are in the main cases where the testator had made an agreement to devise certain property, or had entered into a contract for the future execution of such a will. There was no agreement in the case at bar,

separate and distinct from the will, which could bind the testator."

Coulson v. Alpaugh, 163 Ill. 298, involved a question of a precatory trust, and we see no bearing which it can have upon the case here.

In Drennan v. Douglas, 102 Ill. 341, it was held that the consideration for the alleged promise arose from an illegal and immoral relationship between the parties, and hence that the agreement would not be enforced in a court of equity. And the court expressly declined to pass upon the question here involved, saying: " Under the facts of this case we do not deem it necessary to enter upon a consideration of the authorities, and determine the question whether a court of equity would or would not, under all circumstances, refuse relief when a bill is filed to enforce the specific performance of a contract to make a will." We find nothing in any of these cases, relied upon by counsel for appellee, which supports their contention. And, while there has been no case, so far as we are advised, where our Supreme Court has sustained a decree specifically enforcing such an agreement as the one here, yet there has been a later expression of that court which, we think, clearly indicates its view of the weight of authority upon the subject.

In Dicken v. McKinley, 163 Ill. 318, the court, while holding that the contract in that case was not enforceable because barred by the statute of frauds, said : " The weight of authority is in favor of the position that a man may make a valid agreement to dispose of his property in a particular way by will, and that such contract may be enforced in equity after his decease against his heirs, devisees or personal representatives. But such contracts are looked upon with suspicion, and are only sustained when established by the clearest and strongest evidence."

We regard the contract here as established by clear, positive and uncontroverted evidence. Nor was it a loose or a casual arrangement, but a very distinct agreement made in the presence of the lawyers who represented the parties and who undertook to preserve evidence of the transaction by

having a will prepared, executed and deposited for safe keeping.

It is also urged by counsel for appellee that even if such contract exists, and be held valid, yet it can not operate to limit the power of the owner to use or dispose of his property during lifetime. This, as a general proposition, is correct, and is amply supported by the authorities. Jones v. Martin, *supra;* Fortescue v. Hennah, *supra;* Logan v. Weinholt, *supra;* Needham v. Kirkman, 3 Barn. & Ald. 531; Austin v. Davis, 128 Ind. 472. See also cases cited in note to Krell v. Codman, 14 L. R. A. 860.

But it is as well established that this unrestricted power of disposal by use or by gift *inter vivos* does not extend to permit a disposal during life which is in effect a testamentary disposal and contrary to the agreement. Gregor v. Kemp, *supra;* Fortescue v. Hennah, *supra;* Logan v. Weinholt, *supra;* Van Duyne v. Vreeland, *supra;* Jones v. Martin, *supra;* Bradish v. Bradish, 2 Ball. & Beat. 479; Johnson v. Hubbell, *supra.*

It would seem clear from these authorities that any disposition during life, which was made for the purpose of effecting a testamentary disposal of the property subject to the agreement in a manner different from the provision of the agreement, would be ineffective as against the enforcement of the agreement. In Gregor v. Kemp the chancellor was of opinion "that notwithstanding the articles, Mrs. Kemp was not restrained from disposing of her estate any way in her lifetime, and had full power over it, but with this single exception, viz., she was restrained from making a distribution on purpose to defeat the covenant. * * * And the disposition is a plain fraud. * * *. But supposing this disposition had not been with this avowed design to evade the article, yet we should have thought it, as it is circumstanced, a *donatio mortis causa* and not good, for otherwise articles of this nature will signify nothing, if they are thus eluded by a disposition a day or two before death."

In Johnson v. Hubbell, the chancellor said in this rela-

tion:  " But then the gifts which he makes in his lifetime to B. must be out and out.   For if, to defraud or defeat the obligation which he has thus entered into, he gives to B. any property, real or personal, over which he retains a control, or in which he reserves an interest to himself, then, in order to protect the agreement or obligation, and to prevent his escaping, as it were, from his own contract, courts of equity will treat this gift to B. in the same manner as if it were purely testamentary and were included in a will; and the subject-matter of the gift will be brought back and made the fund out of which to perform the obligation."

In Van Duyne v. Vreeland, the chancellor said:   " The agreement put no restraint whatever upon the parties to the free and unrestricted enjoyment of their property. They might give it away while they lived, but they could not make a disposition of it to take effect at their death. *  *  *  The defendant Vreeland had a perfect right to dispose of the property as he pleased, provided he did not make a disposition of it to take effect after his death, which would have been a fraud in law, or constructive fraud upon the agreement, whether he intended it as a fraud or not, or a disposition of it for the sole purpose of defrauding the complainant and depriving him of the benefit of his agreement which would have been an actual and positive fraud. *  *  *  After a careful examination of this part of the case, the conviction is produced upon my mind that there was actual fraud in this transaction, and that it was resorted to by the parties for the purpose of defrauding the complainant, and of placing the property in such a position that he could derive no benefit from it after the death of Vreeland."

In Fortescue v. Hannah, it was said :   " It seems to me that the spirit of such a covenant requires that every disposition should be excluded which is in its effect testamentary, though not such in point of form."   The question in that case was as to a gift by the maker of the agreement with a reservation to himself of an interest during his life, and the court held that such gift was testamentary in character.

In Logan v. Weinholt, the chancellor said, in referring to the decision in Jones v. Martin, *supra:* "His honor here lays down the principle to which I have adverted, that if in substance and effect the conveyance defeats or defrauds the obligation entered into, and is done with that object, having that tendency, producing that effect, though not in form testamentary, it is to be dealt with as if in fact it were testamentary, for the purpose of protecting the right, for the purpose of defeating the fraud, for the purpose of securing to the party under the agreement the right to that part of the estate to which he is entitled."

A valid agreement with appellants and consideration therefor, as alleged, having been established by the evidence, it remains to inquire whether the gift to appellee, though made *inter vivos* and absolute in form, was intended by the parties, donor and donee, to be testamentary in effect, and hence in fraud of the agreement. The evidence discloses that Mrs. Whiton at the time of the gift to appellee, which included all her property of every description, was living abroad. She was the widow of a former member of the Chicago bar, and it is apparent from all the facts in evidence that she was well advanced in years and without any earning capacity whatever when she thus divested herself of all her property and means of subsistence by this gift to appellee. It also appears that after the gift and until the time of her death, which followed some eleven weeks thereafter, Mrs. Whiton was supported, that is, her expenses were paid, by appellee. It is difficult to perceive how any doubt can exist as to the testamentary character of this gift. Surely this complete surrender of all her possessions, in a foreign land, and with no other reliance for support, could have been made by no sane person, save in view of immediate death or with a reservation of an interest, viz., her support therefrom during life. In either event the gift was of testamentary effect. If the gift was made in view of the near approach of death, it could not matter, so far as the character and purpose of the gift is concerned, that the expected death followed in eleven weeks rather

Whiton v. Whiton.

than in a day or two, as in the case of Gregor v. Kemp. Nor would the fact that the reservation of an interest, to the extent of support through life, was by secret understanding, make the effect of such reservation any different. If any doubt remained, upon this state of facts, we think it would be settled by the answer and testimony of appellee. The answer alleges that appellants " were at all times since the death of their father aware and were frequently informed by the said Louise L. Whiton, that she intended to leave her entire estate to her daughter, this defendant, and that she had made, executed and declared her last will and testament, making such disposition of her entire estate." And further "this defendant admits that on or about the 12th day of October, A. D. 1896, while the said Louise L. Whiton and this defendant were sojourning together at Vienna, Austria, the said Louise L. Whiton, in compliance with her oft-repeated statement of her intention so to do, as hereinbefore set forth, duly transferred, assigned and delivered to this defendant all of the property and estate of the said Louise L. Whiton," etc. The intention, in compliance with which the gift is thus admitted to have been made, was an intention to "leave her entire estate to her daughter, this defendant." Appellee testified : " She (Mrs. Whiton) told me they wanted her to make one (a will) and that she always intended to leave her property to me."

It was admitted at the trial that the transfer to appellee was a gift, without consideration. Appellee testified that she paid the expenses of Mrs. Whiton from the time of the gift until her death. The will of November 21, 1895, executed after the will of June 5, 1895, which had been removed by Mrs. Whiton from the Northern Trust Company, made appellee the chief legatee. It thus appears from all the evidence that it was the great desire and fixed intention of Mrs. Whiton to leave her entire estate to appellee, and that it was in compliance with this intent that the gift was made. Such is the color given the transaction by appellee, the donee and only living witness as to what was done. We hold, therefore, that while no question could be successfully

raised as to the complete dominion of Mrs. Whiton over her property after the making of the agreement with appellants, provided such dominion was exercised in her lifetime by use, conveyance or gift absolute and in no manner testamentary in character, yet that the circumstances of this case are such as to clearly fix upon the gift to appellee a testamentary character, and hence to make it a fraud upon the agreement with appellants and subject to the equitable enforcement of that agreement.

The consideration for the agreement, viz., the relinquishment of $8,000 to which appellants were entitled, was fully performed. The will containing the conditions of this undertaking by Mrs. Whiton was in writing. We think that the statute of frauds does not apply. Davison v. Davison, 2 Beas. (N. J.) 246; Brinker v. Brinker, 7 Pa. St. 53.

The decision reached makes it unnecessary to consider other questions raised by the briefs.

The decree is reversed and the cause remanded for further proceedings consistent with this decision. Reversed and remanded.