### In re QUORUM LIMITED PARTNERSHIP, Debtor.

### Bankruptcy No. 96–11547.

United States Bankruptcy Court, D. New Hampshire.

June 25, 1996.

James M. Liston, Jeffrey S. Ogilvie, Stroock, Stroock & Lavan, Boston, MA, Timothy P. Smith, Manchester, NH, for Debtor.

Daniel J. Callaghan, Devine, Millimet, PA, Manchester, NH, Peter Friedenberg, Rackemann, Sawyer & Brewster, Boston, MA, Gordon M. Orloff, Rackemann, Sawyer & Brewster, Boston, MA, for Yasuda Bank & Trust.

*MEMORANDUM OPINION*

JAMES E. YACOS, Chief Judge.

This chapter 11 proceeding came before the Court on June 21, 1996 after considerable testimony, briefing, extensive affidavits and documentation and oral argument concerning the motion of the primary secured creditor, Yasuda Bank, seeking dismissal of the case "for cause" under § 1112 of the Bankruptcy Code as a bad faith filing on various grounds. The general partners of this limited partnership are Raymond and Barbara Carye, husband and wife, who have a 96 percent interest in the partnership. Their children have the remaining four percent.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

The partnership in question was formed in late May of 1996 at which time properties previously held by the Caryes in various trusts and other entities were transferred into the limited partnership. The chapter 11 petition was filed on June 5, 1996. The transfers occurred a week or two before the expiration of a "stand-still" agreement be-

tween Yasuda Bank and the Caryes for their various entities, which was entered into in February 1996, and covered a three month period of forbearance whereby Yasuda, although having called a default with regard to the nonpayment of taxes, agreed not to institute any foreclosure action for the period of forbearance expiring on May 28, 1996.

There is some dispute as to whether the Caryes or their entities did comply with the terms of the forbearance agreement but that is not particularly relevant to this Court at this time in view of the fact that the agreement was a short three month agreement which was scheduled to expire shortly after the disputed nonpayment of certain funds into an escrow account.

The record indicates that these loans were in default by virtue of nonpayment of taxes of approximately $1.5 million over a period of 1993 to date. While the debtor argues that a certain agreement with the predecessor secured creditor, The Teachers Insurance and Annuity Association ("TIAA") would have excused the default, the Court believes from what was presented that it seems to be clear that there was simply an agreement about suspension of remedies and that defaults for nonpayment of taxes continued notwithstanding the agreement referred to above.

The secured loans in question were originally obtained from TIAA and were all nonrecourse loans to the Caryes and/or their entities and did not include any personal guarantees by the Caryes individually.

The transfer of the entities in late May of 1996 in my judgment was clearly made in contemplation of a filing of a bankruptcy petition as it appeared very likely that the bank would immediately move to foreclose on the expiration of the forbearance agreement on May 28, 1996. To some extent it is correct that combining the entities into one entity would have made it easier to deal with then with any investor but the Court does not believe that takes away from the fact that the transfer also was in contemplation of the filing of the chapter 11 petition.

On the other hand, the transfer of the properties into this debtor entity in May did not significantly change the rights of Yasuda

Bank since the liens obviously followed the properties and since they had no recourse or personal liability of the Caryes to pursue.

The loans in question were taken out in approximately 1980. There were some defaults in tax payments in the 1987–1988 time frame which apparently were resolved to some extent during the period up to 1993, but thereafter no payments on taxes on the four properties involved, three of which are in Chelmsford, Massachusetts and one of which is in Concord, New Hampshire, were made for the 1993 tax year and beyond, except for a payment of $75,000 in January of 1996 and a payout of $75,000 in March of 1996. The second payment was part of the agreement with Yasuda for the forbearance period and came from the personal funds of the Caryes.

The record is sufficient for the Court to infer that part of the problem is not just the vacancies that the Careys have experienced with these properties but also the fact that they have an individual tax problems relating to how the properties are disposed of that block certain alternative deals that may be available.

The debtor has introduced a letter of intent by Berkeley Investments, Inc., Real Estate Advisors, of Boston, Massachusetts. The letter of intent indicates that after a 30 day inspection period, and then in their sole discretion, they may be willing and agreeable to going into a joint venture agreement with the owner partner, i.e., Quorum, whereby Berkeley would fund up to $500,000 "plus such other amount as the equity partner and owner partner may agree upon" and to be set forth in a joint venture agreement. Under such an agreement Berkeley would obtain a 50 percent ownership interest in the venture. The agreement would then also provide among other things for additional capital calls from each the owner partner and the equity partner after formation of the venture.

The debtor in response to the motion has filed an affidavit of Mr. Carey that has attached to it a number of projections which would purport to show that they can fund a repayment of the taxes in question, the unpaid taxes and interest thereon, and pay-

ments to the mortgagees and creditors, out of the projected future rental stream from these four properties. The fact of the matter with "projections" however is that they are just that [1] and the history of this case indicates that starting in 1988, but more particularly from 1993 to date, the properties have simply been unable to generate a sufficient income stream to cover the property taxes. It does appear uncontested, at least at this stage, that the property values approximate or are equal to the encumbrances thereon, but taxes accrue interest at a substantial rate. Aside from what might be shown in a full-scale reorganization process, the Court is not convinced that these projections on the present record have sufficient weight to support a showing of economic viability per se with regard to the prospects for reorganization.

For one thing, the projections assume no vacancies on the properties after about three months out, which seems unrealistic to the Court even if the rate in the particular area is down to four or five percent at the moment. The business cycle goes up; the business cycle goes down. They also assume an increasing rental stream which hasn't really been addressed in testimony. For the Court to rely on the projections themselves the Court would have to have some background information as to the assumptions leading to the increasing rental stream.

The debtor has proposed adequate protection payments to Yasuda to cover the period up to confirmation of a successful plan of $47,000 per month representing 75 percent of the accruing interest to Yasuda on the loans; $24,000 for interest accruing on the unpaid taxes; and $35,000 per month for the accruing monthly amount of property taxes on a current basis to be paid in advance to the respective taxing agencies. This totals $106,000 per month and the debtor represented that it could make the first payment within a few days and would make monthly payments on the 15th of each month thereafter. The first payment would be for the month of June.

The letter of intent of Berkeley Investments, Inc., (Exhibit 2) indicates that after the 30 days required for inspection to determine they will enter into a financing or joint venture agreement they would then require approximately 45 days thereafter to close on such an agreement and to put it into effect.

The parties have argued a number of issues about dismissal of a case in this context. The movant relies on the decision in this district in *Assembled Interests, Inc.,* 117 B.R. 31 (Bankr.D.N.H.1990), with facts similar to the present facts although as the debtor's counsel points out there was not much discussion of the economic asset and liability picture of the debtor in question in that decision.

The movant also relies on decisions of this and other courts dismissing as a bad faith filing what is essentially a two-party dispute. See, e.g., *In re Van Owen Car Wash, Inc.,* 82 B.R. 671 (Bankr.C.D.Cal.1988); *In re Sirius Systems, Inc.,* 112 B.R. 50 (Bankr.D.N.H. 1990); and *In re Nesenkeag, Inc.,* 131 B.R. 246 (Bankr.D.N.H.1991).

The movant points out in that regard that the total debts involved here are approximately $1.5 million in property taxes on the four properties; approximately $8.2 million owing on the Yasuda loans; approximately $300,000 to Fleet mortgage, who has a junior mortgage to Yasuda on one of the properties; and approximately $46,000 worth of unsecured creditors. The latter is comprised of essentially one month's electric bill of $20,000 for the various properties and the balance divided among the monies owed to attorneys employed by the Careys and/or their entities, a landscaping bill, and three tenants with tax escrow claims.

Suffice it to say that this case in my judgment is essentially a dispute between a mortgagor and a secured creditor as to restructuring of the mortgage in question, with no other substantial parties in interest affected, other than a relatively small amount of unsecured debt that in my judgment could have

---

1. The projections submitted by the debtor are not "Financial Forecasts" setting forth all underlying assumptions and contingencies in accordance with AICPA accounting and reporting standards.

While bankruptcy courts currently do not generally require the latter in all cases and in all stages of a reorganization the difference is worth bearing in mind.

and would have been paid by the enterprise and/or the equity holders if it were necessary to otherwise salvage the properties. Judge Queenan in the District of Massachusetts recently in *In re Victoria Limited Partnership*, 187 B.R. 54 (Bankr.D.Mass.1995) has ruled that such "reorganizations" are permissible under chapter 11 since there is nothing under the Code that expressly excludes them. That decision is one of the few taking that position although as Judge Queenan points out his decision was rendered after the Supreme Court decision in *In re Toibb*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) ruling that a individual can file a chapter 11 case whether or not the individual is in a business enterprise since the Bankruptcy Code does not expressly exclude such debtors from relief.

Accordingly, while the great weight of authority is that a simple restructuring of mortgage obligations essentially involving just the mortgagor and the secured creditor is not a good faith filing and can be dismissed for cause, Judge Queenan does make an interesting point for analysis and that is how do those rulings square with recent Supreme Court decisions dealing with the proper construction of the Bankruptcy Code[2].

The present case presents facts which I believe could support a dismissal under *In re Assembled Interests*, 117 B.R. 31 (Bankr. D.N.H.1990), on the "new debtor" syndrome. With regard to the alternative "two party" syndrome, this case also arguably would support dismissal on that basis as well since it seems obvious that the real parties in interest here are and will be Yasuda and the Caryes.

The Court however has considered whether that drastic remedy is always appropriate in this context and has developed a sort of middle ground regarding "for cause" discretionary dismissals, as reflected in *In re Sirius Systems, Inc.*, 112 B.R. 50 (Bankr.D.N.H. 1990), in which I ruled that even though dismissal was permissible in such cases it is

not necessarily always the result that the Court must select. That case involved a dispute between shareholders, with a solvent corporation, that could have jeopardized ultimate payout to creditors if the bitter stalemate between the shareholders continued and it was stipulated by the petitioner there that a neutral chapter 11 trustee would be brought in immediately.

In the present case the additional factors that arguably would not necessitate the drastic remedy of dismissal include the fact that the debtor's equity holders advanced some substantial monies of their own this year to cover past taxes and have negotiated with both Yasuda and the taxing entities toward a restructuring that would result in Yasuda being paid off and the taxes being paid off in due course. The debtor also has in hand a letter of intent indicating some considered attention to these properties and the possibility of a joint venture arrangement that would inject additional monies to support feasible projections for a plan. Finally, the transfer of the properties to the new entity has not by itself, on the particular facts involved, caused specific prejudice to the objecting creditor.

My judgment therefore is that while arguably this record would support dismissal on either or both of the grounds asserted by the movant, on balance, considering this entire record, the Court does not believe that that result is mandated and that dismissal for cause should be denied at this time. However, the record does support the establishment of short time frame for the reorganization effort and indicates that if the case is to stay here, it should be under mandatory and absolute time deadlines to demonstrate that the economic viability that the debtor contends exists is in fact implemented. Accordingly the Court will separately enter its Order denying the motion for dismissal which will itself establish appropriate deadlines and will reference appropriate adequate protection payments to the movant in the interim.[3]

---

2. It should be noted that the Supreme Court itself has not always ruled that "silence" implies a particular result in the general recodification of the Bankruptcy Code in 1978. Compare *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), with *Dewsn-*

*up v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

3. A copy of the Order is attached as an Annex to this Opinion.

UNITED STATES
BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:

Quorum Limited Partnership,

Debtor

BK No. 96–11547

Chapter 11

*ORDER*

JAMES E. YACOS, Chief Judge.

This chapter 11 proceeding came before the Court on June 21, 1996 on a Motion to Dismiss filed by Yasuda Bank. After hearing all parties present and in accordance with the findings and conclusions set forth in the Memorandum Opinion of even date, it is hereby

ORDERED, ADJUDGED and DE-CREED as follows:

1. The Motion to Dismiss is denied.

2. The debtor shall make adequate protection payments to the Yasuda Bank and Fleet Bank as provided in the separate Order on cash collateral usage entered this date.

3. The debtor shall file its plan and disclosure statement on or before *August 1, 1996* and shall include therein or as an exhibit an executed agreement for refinancing and/or a joint venture arrangement sufficient to render the plan feasible.

4. If the debtor complies with the filing indicated above, the Court will hold a combined disclosure statement and confirmation hearing at *3:00 p.m.* on *August 29, 1996,* in the Bankruptcy Courtroom, 4th Floor, 275 Chestnut Street, Manchester, New Hampshire.

5. Any plan filed for confirmation which includes as a part thereof an agreement with a third party for refinancing and/or joint venture participation which requires a closing shall provide for closing no later than *September 16, 1996.*

6. The above deadlines are absolute and will not be extended save for the possibility that any shortfall in funding might be supported by an appropriate commitment by the equity holders to inject sufficient funds into the estate to render the plan feasible, together with their own personal financial statements to assure that what they represent they will do under their commitment they can in fact do.

DONE and ORDERED this 25 day of June, 1996 at Manchester, New Hampshire.